UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-60196-CR-DIMITROULEAS

**UNITED STATES OF AMERICA,**

vs.

**ROBERT ZILDJIAN MONDRAGON,**

**Defendant.**
_____/

**THE UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO
THE DEFENDANT'S MOTION TO DISMISS COUNT THREE OF THE INDICTMENT**

The United States of America, by and through the undersigned Assistant United States Attorney, hereby files this response in opposition to defendant Robert Zildjian Mondragon's motion to dismiss count three of the Indictment, which charges Mondragon with being a unlawful drug user in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(3). For the reasons set forth below, this Court should deny the motion.

**ARGUMENT**

Pursuant to the Second Amendment of the United States Constitution, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This right, like the other rights set forth in the United States Constitution, are not without limits. See District of Columbia v. Heller, 554 U.S. 570, 626 (2008).

1

In District of Columbia v. Heller, the Supreme Court recognized the Second Amendment's protection of "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 635. The Supreme Court noted, however:

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose…. [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons ….

Id. at 626 (emphasis added).

Subsequently, in McDonald v. City of Chicago, 561 U.S. 742 (2010), a plurality of the Supreme Court "repeat[ed]" its "assurances" that Heller "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" 561 U.S. at 786 (quoting Heller, 554 U.S. at 626). It reiterated that protecting the "lawful purpose of self-defense" was "'the central component' of the Second Amendment right." 561 U.S. at 767 (quoting Heller, 554 U.S. at 599, 630).

Applying Heller, the Eleventh Circuit examined "the initial question" of "whether one is *qualified* to possess a firearm" under the Second Amendment. Rozier, 598 F.3d at 770 (emphasis in original). Rozier expressly affirmed § 922(g)(1)'s ban on felon possession of firearms, because felons categorically were a "certain class[] of people" whose firearm possession was not protected. 598 F.3d at 771. As the Eleventh Circuit later explained, "being a member of 'the people' to whom the Second Amendment applies as a general matter is a *necessary* condition to enjoyment of the right to keep and bear arms, but it is not alone *sufficient*." United States v. Jimenez-Shilon, 34 F.4th 1042, 1044 (11th Cir. 2022) (emphasis in original). "[T]he Second Amendment's text shows that it codified what the Heller Court called a 'pre-existing right' … and that right's particular history
2

demonstrates that it extended (and thus extends) to some categories of individuals, but not others." *Id.* (quoting *Heller*, 554 U.S. at 592, 603). Judge Newsom's controlling opinion for the court in Jimenez-Shilon recognized that "certain groups of people—even those who might be among 'the people'—may be 'disqualified from' possessing arms without violating the Second Amendment." 34 F.4th at 1044. Only those people with a pre-existing right to bear arm had that right protected by the Second Amendment.

Because the Second Amendment "codif[ied] a preexisting right," id. at 603, courts discern that right's limits by examining a variety of sources from our Nation's history, Jimenez-Shilon, 34 F.4th at 1044 (quoting Heller, 554 U.S. at 605). As the Eleventh Circuit has explained, the "particular history" of the right "to keep and bear Arms" shows that the right "extended (and thus extends) to some categories of individuals, but not others." Jimenez-Shilon, 34 F.4th at 1044. In surveying the right's history, the Supreme Court has repeatedly described the class of individuals to which the right extends as "law-abiding, responsible citizens." See, e.g., Heller, 554 U.S. at 635; New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111, 2156 (2022). Consistent with that understanding of the right's scope, the Court in Heller warned that "nothing in [its] opinion should be taken to cast doubt" on "longstanding prohibitions on the possession of firearms," including regulations disarming "felons and the mentally ill." 554 U.S. at 626. Heller listed these regulations "only as examples" and left the identification of additional categories of lawful regulations "to future evaluation." Id. at 627 n.26, 635. A plurality of the Court "repeat[ed]" Heller's

3

"assurances" in McDonald v. City of Chicago, 561 U.S. 742, 786 (2010), and in Bruen, six Justices reiterated those assurances yet again.[1]

The same historical sources the Supreme Court invoked in identifying an individual right to bear arms also reflect that the right is limited to "law-abiding, responsible citizens." Heller, 554 U.S. at 635. For example, Heller described as a "highly influential" "Second Amendment precursor[]," id. at 603-04, a proposal by delegates to Pennsylvania's constitutional convention stating that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals," 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971). As the D.C. Circuit has observed, this proposal "indicates that criminals, in addition to those who posed a 'real danger' (such as the mentally ill, perhaps) were proper subjects of disarmament." Medina v. Whitaker, 913 F.3d 152, 158-159 (D.C. Cir. 2019). And although the proposal did not prevail at the Pennsylvania convention, it was vindicated four years later through the adoption of the Bill of Rights, eight provisions of which— including the Second Amendment— echoed a set of amendments first proposed by the Pennsylvania delegates. 2 Schwartz at 628. "[I]nfluential" proponents of the Second Amendment thus understood the "pre-existing right" the Amendment codified as permitting legislatures to disarm individuals

---

[1] See Bruen, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional under Heller and McDonald (quoting Heller, 554 U.S. at 626)); id. at 2157 (Alito, J., concurring) (explaining that Bruen did not "disturb[] anything that [the Court] said in Heller or McDonald . . . about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)); id. at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) (agreeing that "the Court's opinion" should be understood as "cast[ing] no doubt on [the] aspect of Heller's holding" permitting felons and the mentally ill to be prohibited from possessing firearms); see also New York State Rifle & Pistol Ass'n v. City of New York, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting) (recognizing that "history support[s] the constitutionality of some laws limiting the right to possess a firearm," including laws "prohibiting possession by felons and other dangerous individuals").

4

who either demonstrated disrespect for the law or who threatened public safety. Heller, 554 U.S. at 603-04.

This Court has accordingly recognized that the Supreme Court's description of the right as limited to "law-abiding and qualified individuals[] . . . is not dicta" and has approved a variety of regulations disarming individuals outside that class. United States v. Rozier, 598 F.3d 768, 771 & n.6 (11th Cir. 2010). In Rozier, for example, the Court concluded that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." Id. at 771. In Jimenez-Shilon, the Eleventh Circuit similarly noted, in the course of addressing a different Second Amendment question, that "those suffering from mental illness[] . . . may be prohibited from possessing firearms without offending the Second Amendment." 34 F.4th at 1046. And in United States v. White, the Court explained that, while the federal law disarming domestic-violence misdemeanants is absent from "Heller's list," it "warrants inclusion" because it regulates "dangerous" individuals. 593 F.3d 1199, 1205-06 (11th Cir. 2010) (citation omitted). What these cases have in common is that in each, the Court endorsed regulations disqualifying individuals who are not law abiding, responsible, or both.

Title 18, United States Code, Section 922(g)(3), which proscribed the possession of firearms by anyone who is an unlawful user of a controlled substance, including marijuana, does not restrict arms-bearing by law-abiding, responsible citizens. Two features of the statute compel that conclusion. First, the term "unlawful user" refers to an individual engaged in "regular and ongoing" law violations. United States v. Edmonds, 348 F.3d 950, 953 (11th Cir. 2003) (per curiam). Second, those law violations involve the use of "controlled substances" known to impair the skills needed to safely handle firearms, see, e.g., Fla. Stat. § 381.986(4)(a)(8)(a), (4)(a)(8)(e) (recognizing that

5

marijuana can impede "coordination, motor skills, and cognition"). Thus, Section 922(g)(3) disarms individuals who are neither law-abiding nor responsible with respect to firearms. Although the Eleventh Circuit has not yet squarely addressed a Second Amendment challenge to Section 922(g)(3), other courts of appeals have consistently recognized that the prohibition is analogous to the restrictions "on the possession of firearms by felons and the mentally ill" endorsed by the Supreme Court and this Court. Heller, 554 U.S. at 626. The Fifth Circuit has explained that "like felons," regular drug users "pose a risk to society" and may therefore be constitutionally disarmed. United States v. Patterson, 431 F.3d 832, 835-36 (5th Cir. 2005); see United States v. May, 538 F. App'x 465, 466 (5th Cir. 2013) (unpublished) (reiterating that disarming "unlawful users of controlled substances" is consistent with the Second Amendment). The Ninth Circuit has similarly held that "like career criminals and the mentally ill," regular drug users "more likely will have difficulty exercising self-control, particularly when they are under the influence of controlled substances." United States v. Dugan, 657 F.3d 998, 999 (9th Cir. 2011). And the Eighth Circuit has likewise concluded that Section 922(g)(3) "has the same historical pedigree as other portions of § 922(g)," including the provisions disarming felons and the mentally ill that this Court has approved. United States v. Seay, 620 F.3d 919, 925 (8th Cir. 2010). The Supreme Court's decision in Bruen reinforces the conclusion that Section 922(g)(3) is constitutional. Although Bruen invalidated New York's "may issue" licensing regime, it approved "shall-issue" regimes that "require applicants to undergo a background check." 142 S. Ct. at 2138 n.9; see id. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible[] . . . ."). Those background checks often preclude the public carriage of firearms by individuals with felony convictions, adjudications of mental illness or commitments to mental institutions, and recent

6

drug use. Because these types of prerequisites are "designed to ensure only that those bearing arms in [a] jurisdiction are, in fact, 'law-abiding, responsible citizens,'" the Supreme Court indicated that they generally pass constitutional muster. 142 S. Ct. at 2138 n.9 (majority op.) (quoting Heller, 554 U.S. at 635). Bruen therefore reflects that unlawful drug users, like those convicted of felonies or suffering from mental illnesses, are not law-abiding, responsible citizens constitutionally entitled to possess firearms. Courts have thus overwhelmingly rejected Second Amendment challenges to Section 922(g)(3), both before and after Bruen. No court of appeals has ever sustained such a challenge, and at least a half dozen circuits have denied them. See, e.g., United States v. Carter, 750 F.3d 462, 466-68 (4th Cir. 2014); United States v. Yancey, 621 F.3d 681, 683-87 (7th Cir. 2010); United States v. Richard, 350 F. App'x 252, 260 (10th Cir. 2009); United States v. Patterson, 431 F.3d 832, 835-36 (5th Cir. 2005); United States v. Dugan, 657 F.3d 998, 999 (9th Cir. 2011); United States v. Seay, 620 F.3d 919, 925 (8th Cir. 2010). Although some court of appeals opinions apply the means-ends test Bruen eschewed, several others—including the Fifth, Eighth, and Ninth Circuit opinions cited above— rest on the analogy between Section 922(g)(3) and the "longstanding prohibitions" Heller endorsed, 554 U.S. at 626, and on which six Justices in Bruen took pains not to cast doubt, see, e.g., 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring).

In keeping with these authorities, to the government's knowledge 12 of 13 district courts to confront challenges to Section 922(g)(3) after Bruen have rejected them.[2] The lone outlier

---

[2] In addition to the district court decision at issue here, those decisions are: United States v. Black, No. 22-133-01, 2023 WL 122920, at *2-4 (W.D. La. Jan. 6, 2023); United States v. Beverly, No. 2:21-cr-36, slip op. at 1-4 (N.D. W. Va. Jan. 3, 2023); United States v. Connelly, No. EP-22-cr-229(2)-KC, 2022 WL 17829158, at *1-4 (W.D. Tex. Dec. 21, 2022); United States v. Daniels, No. 1:22-cr-58-LG-RHWR-1, 2022 WL 2654232, at *2-5 (S.D. Miss. July 8, 2022); United States v. Kelley, No. 5:22-cr-395, slip op. at 1-11 (W.D. Okla. Jan. 13, 2023); United States v. Lewis, No. CR-22-368-F, 2023 WL 187582, at *1-5 (W.D. Okla. Jan. 13, 2023); United States v. Posey, No. 2:22-CR-83 JD, 2023 WL 1869095, at *2-6 (N.D. Ind. Feb. 9, 2023); United States v. Randall, No. 4:22-CR-99, slip op. at 2-6 (S.D. Iowa Feb. 14, 2023); United States v. Sanchez, No. W21-CR-00213-ADA, 2022 WL 17815116, at *2-4 (W.D. Tex. Dec. 19, 2022); United States v. Seiwert, No. 20-CR-443,

proceeded primarily not by distinguishing Section 922(g)(3) from the longstanding prohibition disqualifying felons but by questioning the constitutionality of that prohibition as well, see United States v. Harrison, No. CR-22- 00328-PRW, 2023 WL1771138, at *9-17 (W.D. Okla. Feb. 3, 2023)—an incorrect result which no other federal court has embraced and which flatly contradicts this Court's precedent, see Rozier, 598 F.3d at 771; United States v. Posey, No. 2:22-CR-83 JD, 2023 WL 1869095, at *9 n.9 (N.D. Ind. Feb. 9, 2023) (observing that Harrison represents a "dramatic departure from existing precedent"). Indeed, since Bruen more than a significant number of district courts have repudiated challenges to the felon-dispossession provision. See Range v. Att'y Gen., 53 F.4th 262, 268 n.6 (3d Cir. 2022) (collecting dozens of examples), vacated upon granting of reh'g en banc, No. 21-2835, 2023 WL 118469 (Jan. 6, 2023).

At its core, Congress adopted the disqualifications set forth under Title 18, United States Code, Section 922(g) in order to "keep firearms away from the persons [it] classified as potentially irresponsible and dangerous." Barrett v. United States, 423 U.S. 212, 218 (1976). After an extensive inquiry that included "filed investigation and public hearings," S. Rep. No. 88-1340, at 1-2 (1964), Congress recognized the "ready availability" of firearms to "narcotic addicts," "criminals," and "others whose possession of firearms is similarly contrary to the public interest" as "a matter of serious national concern," S. Rep. No. 90-1501, at 22 (1968). This resulted in the prohibition against unlawful drug users possessing firearms. See Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1220-21 (codified at 18 U.S.C.§ 922(g)(3)).

---

2022 WL 4534605, *1-3 (N.D. Ill. Sept. 28, 2022); United States v. Stennerson, CR-22-139-BLG-SPW, 2023 WL 2214351, at *1-3 (D. Mont. Feb. 24, 2023); United States v. Veasley, No. 4:20-cr-209, slip op. at 2-4 (S.D. Iowa Sept. 22, 2022); see also State v. Wilfong, 881 S.E. 2d 426, 429 (W. Va. 2022).

Under the governing regulations, an "[u]nlawful user" is someone who "is a current user" of a controlled substance, meaning that "the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct." 27 C.F.R. § 478.11. As this Court has explained, an "unlawful user" is therefore an individual whose drug use is "regular and ongoing . . . during the same time period as the firearm possession." United States v. Edmonds, 348 F.3d 950, 953 (11th Cir. 2003) (per curiam). Section 922(g)(3) thus does not restrict arms-bearing by someone who has "end[ed] his drug abuse." United States v. Yancey, 621 F.3d 681, 686 (7th Cir. 2010) (per curiam). Handling firearms safely requires care, caution, and self-control. Those characteristics are compromised by the use of controlled substances. Marijuana, for example, "can affect . . . the ability to think, judge and reason" and can produce "dizziness, anxiety, confusion, . . . impaired motor skills, paranoia, [and] psychotic symptoms." (Florida Board of Medicine, Medical Marijuana Consent Form). These effects may cause unlawful drug users to store firearms in unsafe ways, allow others to access their firearms, or otherwise handle firearms carelessly. It is therefore "beyond dispute that illegal drug users," like those with mental illnesses, "are likely . . . to experience altered or impaired mental states that affect their judgment and that can lead to irrational or unpredictable behavior." Wilson v. Lynch, 835 F.3d 1083, 1094 (9th Cir. 2016).

Section 922(g)(3) is thus comparable both to laws disarming those who commit serious crimes and to laws disarming those who cannot be trusted to handle firearms safely. In combining these rationales, Section 922(g)(3) parallels the "prohibition against the possession of firearms by persons convicted of the misdemeanor crime of domestic violence" upheld by this Court. White, 593 F.3d at 1205-06. Both prohibitions disarm individuals who commit serious misdemeanors subject to substantial punishment. And both provisions disqualify those who Congress deemed

9

"potentially irresponsible and dangerous," Barrett v. United States, 423 U.S. 212, 218 (1976)—because of a demonstrated propensity for violence, in the case of domestic violence misdemeanants, and because of impaired judgment and self-control, in the case of unlawful drug users. It follows that Section 922(g)(3) is analogous to each of the prohibitions this Court has previously concluded pass constitutional muster and that unlawful users of controlled substances are not law-abiding, responsible citizens to whom the Second Amendment right extends.

Historical tradition permits legislatures to prohibit the possession of a firearm while intoxicated. During the nineteenth century, for example, numerous states—including Kansas, Mississippi, Missouri, and Wisconsin—imposed criminal penalties on intoxicated individuals who possessed, used, or received firearms or pistols.³ As an influential Missouri Supreme Court decision explained, these laws comport with the right to bear arms because they mitigate the "mischief" that may result "from an intoxicated person going abroad with fire-arms." State v. Shelby, 2 S.W. 468, 469 (Mo. 1886). Heller described such nineteenth century laws as a "critical tool of constitutional interpretation," 554 U.S. at 605; see also National Rifle Ass'n v. Bondi, 2023 WL 2484818, at *5 (11th Cir. Mar. 9, 2023) (holding that Reconstruction Era sources are "probative . . . on the scope of the Second Amendment right"), and such laws form part of the relevant historical tradition, see

---

³ See Kan. Sess. Laws 25, § 282 (1867) ("any person under the influence of intoxicating drink" may not "carr[y] on his person a pistol . . . or other deadly weapon"); 1878 Miss. Laws 175-76 § 2 (making it unlawful to sell pistols and certain other weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drink"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."); see also 1909 Id. Sess. Laws 6, no. 62, § 1 (making it a crime for "any person" to "have or carry" any "pistol, revolver, gun or any other deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks"); 1890 Okla. Sess. Laws 495, art. 47, § 4 (officers may not "carry[] . . . arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road).

Bruen, 142 S. Ct. at 2130 n.6 (confirming that "the principle of party presentation" applies in Second Amendment cases).

That legislatures held significant authority to restrict the combination of firearms and alcohol is further illustrated by historical militia laws. As the Second Amendment's text indicates, the framers recognized that armed members of the militia must be "well-regulated," U.S. Const. amend. II, a term that at the time connoted "discipline," Heller, 554 U.S. at 597, and "self-control," Michael Waldman, The Second Amendment: A Biography 61 (Simon & Schuster 2014). For that reason, at least one state excluded "common drunkards" from the militia, see 1844 R.I. Pub. Laws 503-16, § 1, and many others forbade the sale of "any Strong Liquor" near locations where militias mustered and trained. These laws further confirm that the founders understood the risks created when alcohol and firearms coincide and did not intend the Second Amendment to cabin legislatures' substantial latitude to address the problem of intoxicated individuals possessing firearms.

In directing that courts consider "this Nation's historical tradition of firearm regulation," Bruen warned that history does not impose "a regulatory straightjacket." 142 S. Ct. at 2132-33. Thus, the question is not whether a modern law mirrors a "historical twin"; rather, the question is whether the modern law is "relevantly similar" to a "historical analogue." Id. That "analogical inquiry" involves a review of "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. Those metrics establish that Section 922(g)(3) is "relevantly similar" to the historical laws canvassed above, including laws making it a crime to possess firearms while intoxicated and disarming those addicted to drugs. With respect to the "why" metric, both Section 922(g)(3) and historical laws mitigate the "mischief" threatened when intoxicated individuals "go[] abroad with fire-arms." Shelby, 2 S.W. at 469; cf. Bondi, 2023 WL

11

2484818, at *12 (finding the "why" metric satisfied where a modern law and its historical predecessors imposed similar restrictions with the similar purpose of "enhanc[ing] public safety"). And with respect to the "how" metric, both Section 922(g)(3) and historical laws disarm individuals who currently or recurringly use drugs that impair their ability to possess firearms responsibly. Both laws disarming currently intoxicated individuals and laws disarming those addicted to drugs provide "historical analogue[s]" confirming Section 922(g)(3)'s constitutionality. Bruen, 142 S. Ct. at 2133.

As the use of drugs other than alcohol became widespread in America, legislatures began to criminalize the use and possession of those drugs. Such criminal prohibitions were often followed by firearms regulations. Those regulations reflected both legislatures' authority to keep firearms out of the hands of irresponsible individuals and their additional authority, repeatedly recognized by the Supreme Court, to regulate arms-bearing by those who are not "law-abiding." See, e.g., Bruen, 142 S. Ct. at 2122; Heller, 554 U.S. at 625; see also Range, 53 F.4th at 271-81 (collecting examples of historical laws disarming individuals whose conduct demonstrated "disrespect for the rule of law").

The historical laws canvassed above primarily address arms-bearing by users of alcohol, a substance that—with certain exceptions such as Prohibition—has generally been legal throughout American history. Drugs other than alcohol were not widely used as intoxicants in the United States until the late nineteenth and early twentieth centuries. See David F. Musto, Drugs in America: A Documentary History 188-192 (NYU 2002). Prohibitions on narcotic and marijuana use accordingly did not emerge until around the 1880s and the early twentieth century, respectively. See Richard J. Bonnie & Charles H. Whitebread, II, The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition, 56 Va. L. Rev. 971, 996 (1970); id. at 1010 (noting that Utah passed the first state prohibition on cannabis sale or possession in 1915). As

illegal substances proliferated, so too did associated firearms regulations. Particularly relevant here are statutes prohibiting arms-bearing by those addicted to drugs. For example, a 1931 Pennsylvania statute established that "[n]o person shall deliver a firearm . . . to one who he has reasonable cause to believe . . . is a drug addict." 1931 Pa. Laws 499, no. 158, § 8. Following Pennsylvania's lead, jurisdictions across the country—including the District of Columbia, Alabama, California, South Dakota, and Washington—passed laws barring the sale of firearms or pistols to "drug addict[s]." See 47 Stat. 652, § 7 (1932); 1936 Ala. Laws 52, no. 82, § 8; In re Rogers, 66 P.2d 1237, 1238 (Cal. Dist. Ct. App. 1937); 1935 S.D. Sess. Laws 356, ch. 208, § 8; 1935 Wash. Sess. Laws 601, ch. 172, § 8. In a testament to the strength of this historical tradition, prohibitions on firearms possession by unlawful drug users remain prevalent today. Along with the nationwide federal prohibition at issue in this case, the laws of at least twenty-six states and the District of Columbia "have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." Yancey, 621 F.3d at 684 (collecting examples). Section 922(g)(3) thus stands in stark contrast to the "outlier[]" laws the Supreme Court invalidated in Bruen and Heller. Bruen, 142 S. Ct. at 2156; see id. at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring) (emphasizing the "unusual" nature and "outlier" status of the New York law in Bruen); Heller, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"). Unlike those exceptional laws, Section 922(g)(3) reflects a historical tradition that stretches from the founding to the present, and it therefore comports with the Second Amendment.

## CONCLUSION

For these reasons, this Court should deny defendant Robert Zildjian Mondragon's motion to dismiss count three of the Indictment.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: /s/ Ajay J. Alexander
AJAY J. ALEXANDER
Assistant United States Attorney
Court ID No. A5502506
500 E. Broward Blvd., Suite 700
Ft. Lauderdale, Florida 33394
(954) 660-5778 (telephone)
ajay.alexander@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 16, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ Ajay J. Alexander
AJAY J. ALEXANDER
Assistant United States Attorney