UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   23-60196-CR-DIMITROULEAS

UNITED STATES OF AMERICA,
     Plaintiff,
v.

ROBERT MONDRAGON,
     Defendant.
_____/

**DEFENDANT'S REPLY TO GOVERNMENT'S
MOTION TO DEPART ABOVE SENTENCING GUIDELINES**

The Defendant, Robert Mondragon, through undersigned counsel, files this reply to the government's motion to depart above the Sentencing Guidelines at the time of sentencing in this matter [DE:67]. In reply, the Defendant states the following:

The Defendant's federal (and state) criminal prosecutions are certainly out-of-the-ordinary, for many reasons. As this reply to the government's motion for an upward variance will reveal, the charges in this indictment are exceptionally rare. The essential underpinnings in this prosecution (as this reply will also reveal) are based on a tiny portion of the Defendant's chats with his disabled girlfriend, and on an even tinier portion of his social media posts, and the fear those comments and posts cause. In essence, what the government is doing in this prosecution and motion is predictive in nature; the government believes that the Defendant's comments and his 2019 attempt to obtain a firearm reveal a person who intends to carry out

1

murder(s). As such, the government wishes to lock him away for an extended period of time.

The problem with this prediction is that it is merely that: a prediction. It is an opinion. But the evidence does not support this conclusion. While the Defendant has made comments the government notes in their motion, the overwhelming majority of the Defendant's phone searches, chats, and social media posts over the 10-year period the government points to, have nothing to do with obtaining firearms or committing murders. Moreover, aside from one act in 2019 (the subject of counts one and two in this indictment), the Defendant has never actually made any attempt to obtain a firearm. Further, in 2021, when the Defendant had a photograph taken at his father's friend's home with a firearm, he made no attempt to use or obtain the firearm in any way to support a prediction that he wanted to commit a violent act with it. He merely had a smiling photo taken with the firearm (the subject of count three of the indictment).

The second out-of-the-ordinary feature of this case is the Defendant's extensive mental health issues. These issues can be divided into two groups. The first group consists of genetic medical issues he was likely born with. This includes Autism, Bipolar disorder, and ADDHD. The civil legal concept of an "eggshell doctrine" applies to this circumstance: the predators who committed their offenses against the Defendant as a child and younger man, preyed upon an already weakened individual

suffering with these issues. The Defendant was less capable of defending himself than someone without Autism, Bipolar Disorder, and ADDHD.

The second group of mental health issues the Defendant suffers from were derived from those who harmed him; his mother, who used drugs while he was in utero; the multitude of predators who molested him; the foster parents who beat him; the foster system in the state of Florida that took him and placed him in the homes where he was victimized; and finally, the prosecutorial arm of the state, that cut a plea against the person who molested him that would be the envy of any federal sex-case defendant charged with less serious conduct. The story of this Defendant is the story of incredible, repeated governmental failures towards a child that was forced into their "protection."

As this reply will reveal, people sometimes say and post abhorrent, raw, caustic remarks, threats, and social media posts, often when they feel most powerless or victimized. Many "rap" musicians wrote in their lyrics about using guns to kill police in the 1980's and 90's, they never sought to actually carry out the comments, they were expressing powerless outrage at being repeatedly victimized by law enforcement and government during that time period. The notable difference in those case was that the musicians actually had firearms (and used marijuana).

The same phone analysis relied upon by the government in their motion also reveals that the Defendant was desperately seeking help for his variety (described above and herein) of mental health issues. It is hardly surprising, knowing the

Defendant's background, that the Defendant has been Baker Acted on so many occasions, and has harmed and mutilated himself on a multitude of occasions. This reply will reveal that the Defendant had a reason to feel depressed, powerless, and at times, angry, leading him to say things that were caustic and abhorrent. Unlike those who have posted violent rhetoric (as will be shown in this reply) and sent threats to others for political reasons, or for political theatre, the Defendant was charged in this case because of what he stated in comments. The Defendant's acts reveal that he was **not** compulsorily seeking out firearms to commit heinous acts with (nor is there **any** evidence he took **any** steps to acquire anything to carry out **any** of the abhorrent acts he discussed and/or researched). The acts reveal the Defendant made one attempt to legally purchase a firearm, and after that request was denied, made no other attempts. The Defendant's mental health is not a reason to upward vary in this case. It is a reason to downward depart.

**1) This prosecution has always been based upon punishment of conduct that is Constitutionally protected:**

The rarity of prosecutions based upon unlawful marijuana use and firearm possession was noted by this Court at the outset of the Bench trial in this matter (in the Court's first question to the government). The Court's observation in that respect is confirmed by the United States Sentencing Commission. According to the United States Sentencing Commission, prosecutions under § 922(g)(3) are exceedingly rare,

4

and "accounts for only about 5% of prosecutions brought under § 922." *United States v. Harrison,* 654 F.Supp.3d 1191, 1995 (W.D. OK 2023), *citing,* United States Sentencing Commission, *What Do Federal Firearms Offenses Really Look Like?* 24 (July 2022). Within that 5%, the percentage dwindles further when the unlawful drug use pertains to the use of marijuana (rather than drugs such as cocaine or methamphetamine).

The vagueness of the statutes in question (related to the time of the marijuana use), permits such prosecutions in every case where a person owns, possesses, or attempts to obtain a firearm and also has a medicinal marijuana card (according to ATF and the executive branch's interpretation) at the whim of the government. See Defense Exhibit A, admitted without objection during bench trial; *See also, Harrison,* 654 F.Supp.3d at 1213 ("It bears repeating that all the United States would have to prove at trial to justify depriving Harrison of his right to possess a firearm is that he is a user of marijuana"). Even had the Defendant not admitted to using marijuana in 2019, he would have been prosecutable under the government's understanding of the lack of a temporal element in the statute (from defense exhibit A) for answering "no" on the ATF form, because he possessed a medicinal marijuana card.

As such, the Defendant could be, and has been prosecuted for this offense, while it appears few, if any, other holders of medicinal marijuana cards and firearms, are. See, https://www.cannamd.com/florida-firearms-medical-marijuana-nikki-fried-exclusive/ (last accessed July 2, 2024) (Former Agricultural Commissioner Nikki

5

Fried admits she has a medicinal marijuana card and concealed firearms permit in Florida). Similarly, other well-known, admitted users of marijuana, who also own or possess firearms have never been prosecuted under 18 U.S.C. § 922(g)(3) as the Defendant has been (despite the Defendant only having a photo taken with a firearm). Actor and political activist Matthew McConaughey was famously arrested for possession of marijuana in his home, and is also a well-known firearm owner. His ownership of firearms lent him credence while speaking at the White House following the shooting in Uvalde, Texas, despite the fact that he had previously acknowledged that he was a user of marijuana. https://www.fox10tv.com/2022/06/07/matthew-mcconaughey-calls-gun-control-action-white-house/?fbclid=IwZXh0bgNhZW0CMTEAAR0xtNsxHcOGP5hTLOgfG31oxBI5kwCpOWWYZ-NMiAWWdApfFMaA54KEhwI_aem_sPG7eWTerTgcIpkMZlEOyQ (Last accessed July 8, 2024); See also, https://www.independent.co.uk/arts-entertainment/films/news/matthew-mcconaughey-arrest-naked-bongos-greenlights-memoir-b1200362.html (last accessed July 8, 2024). Tracy Marrow, better known as actor and musician "Ice-T," was recently approved by the state of New Jersey to operate a marijuana dispensary in the state. https://www.forbes.com/sites/ajherrington/2022/07/28/rapper-ice-t-gets-approval-for-new-jersey-cannabis-dispensary/ (last accessed July 8, 2024). This is despite the fact that Marrow is an admitted and well-known gun-owner and proponent of Second Amendment rights. https://www.politico.com/story/2012/07/ice-t-guns-are-last-form-

of-defense-078875 (last accessed July 8, 2024). Moreover, Marrow's greatest fame, prior to becoming a television actor as a police officer on "Law & Order," was as the writer and performer of a song that set off a massive First Amendment dispute, titled, "Cop killer," on an album titled, "Body Count." Id; See also, https://www.loudersound.com/features/body-count-story-behind-cop-killer (last accessed July 8, 2024). Marhsall Mathers, better known as musician "Eminem," was convicted of using his firearm to pistol whip a man in 2001. https://www.rollingstone.com/music/music-news/eminem-gets-probation-2-254855/ (last accessed July 8, 2024). At the time he possessed and carried his firearm, Mathers used a variety of drugs. He did not get sober until 2008. https://popculture.com/music/news/eminems-sobriety-story/ (last accessed July 8, 204). In March of this year, musician Bob Ritchie, known as "Kid Rock," while intoxicated, waved a firearm in an interviewer's face while belligerent. Ritchie also informed the reporter he had guns "everywhere." https://www.detroitnews.com/story/entertainment/music/2024/05/21/drunk-and-belligerent-kid-rock-waves-gun-during-unruly-interview/73789328007/ (last accessed July 8, 2024). A month earlier, Ritchie appeared for a national television interview with a cocktail and was intoxicated. https://www.yahoo.com/entertainment/kid-rock-appears-confused-drink-010403927.html?fr=sycsrp_catchall (last accessed July 8, 2024). In 2023, Ritchie famously posted a video to social media of himself using a rifle (possibly automatic in

nature) to shoot cases of beer to protest a partnership between a Transgender artist and a beer brand. https://www.latimes.com/entertainment-arts/story/2023-04-04/kid-rock-bud-light-dylan-mulvaney-transgender (last accessed July 8, 2024). Calvin Broadus, known as actor and musician "Snoop Dogg," is an admitted user of marijuana. https://www.cnn.com/2023/11/20/entertainment/snoop-explains-going-smokeless/index.html (last accessed July 8, 2024); See also, https://www.latimes.com/archives/la-xpm-2007-apr-12-me-snoop12-story.html (last accessed July 8, 2024). Broadus was caught with both 39 grams of marijuana and a firearm in 2007. https://web.archive.org/web/20140112124519/http://da.lacounty.gov/mr/archive/2007/041107a.htm (last accessed July 8, 2024); See also, https://web.archive.org/web/20110810033726/http://today.msnbc.msn.com/id/15441189/ns/today-entertainment/t/snoop-dogg-arrested-california-airport/ (last accessed July 8, 2024). He was arrested on more marijuana related charges in 2012. https://archive.ph/20130616022212/http://www.elpasotimes.com/newupdated/ci_19704657 (last accessed July 8, 2024). Broadus was arrested again for marijuana and possession of a firearm while in the company of purportedly well-known California gang members in 2006. https://web.archive.org/web/20090605213931/http://www.mtv.com/news/articles/1546734/20061129/snoop_dogg.jhtml (last accessed July 8, 2024). In 2021, musician and actor O'Shea Jackson, best known as "Ice Cube," began marketing and selling his own

brand of marijuana. [1] https://www.nme.com/news/music/ice-cube-launches-marijuana-line-fryday-kush-2881911 (last accessed July 8, 2024). In 2016, Jackson famously filmed himself with two other comedians using marijuana. https://www.yahoo.com/entertainment/conan-ice-cube-kevin-hart-smoke-ton-weed-144108197.html?fr=sycsrp_catchall (last accessed July 8, 2024). Jackson reputedly owns a collection of firearms. https://www.33rdsquare.com/rap-icons/ (last accessed July 8, 2024). The lyrics to his famous N.W.A. song, "Straight Outta Compton," describe using multiple firearms to murder people. https://www.azlyrics.com/lyrics/nwa/straightouttacompton.html (last accessed July 8, 2024). In another famous N.W.A. song, the lyrics described the murder of a police officer. https://www.lyrics.com/lyric/9561626#google_vignette (last accessed July 8, 2024). In another song he wrote and recorded as a solo artist, Jackson described hunting down and killing the police officers acquitted in the beating of Rodney King. https://www.azlyrics.com/lyrics/icecube/wehadtotearthismuthafuckaup.html (last accessed July 8, 2024).

Obviously, the lyrics described herein are protected as artistic expression under the First Amendment. They are also expressions of anger and outrage by populations that felt powerless and abused by government, and law enforcement in

---

[1] Fellow firearm enthusiast and bandmate of Jackson's in N.W.A. "Dr. Dre," also markets and sells his own marijuana brand. https://finance.yahoo.com/news/dr-dre-xzibit-wins-lawsuit-103032504.html?fr=sycsrp_catchall (last accessed July 8, 2024).

particular. These revenge seeking fantasies followed that racism, abuse and powerlessness. The Defendant's history in this case reveals the same.

This lack of similar prosecutions is likely due, in large part, to the fact that the Department of Justice itself is advocating for a Schedule change to permit the medicinal use of marijuana. https://www.justice.gov/opa/pr/justice-department-submits-proposed-regulation-reschedule-marijuana (last accessed July 1, 2024).

In this case the facts and evidence contradict the government's claim that the Defendant is a danger to the community. The government did not prosecute the Defendant in 2013, or 2014, or 2015, or 2016, or 2017, or 2018, when they claim he was making statements the government now contends exhibit great dangerousness. Nor was the Defendant prosecuted in 2019, when he attempted to purchase a firearm and indicated he was not an unlawful user of marijuana on ATF form 4473. The Defendant was not prosecuted in 2021, after a photo was posted of him holding a firearm. The government decided that the Defendant was "dangerous" and that he should be prosecuted in 2023, ten years after the statements the government indicates were exhibiting "dangerousness" began being posted, four years after he made his lone attempt to purchase a firearm (unsuccessfully) and two years after he posed for a photo with a firearm. The basis for the prosecution was that, when the Defendant possessed the firearm, and when he applied to purchase a firearm, he was an unlawful user of marijuana. The Defendant has been accused of no violent acts.

10

The government now seeks to not only prosecute the Defendant for this unusual offense that is rarely prosecuted, but also to seek a sentence *above* the Guidelines for it. The government makes their motion for this enhanced sentence by claiming that a sentence within the Guidelines would not "reflect the serious and dangerous nature of Defendant's offenses." [DE:67 at 7]. Yet, the offense conduct in this case constitutes the Defendant checking a box on ATF Form 4473 that he was not an unlawful user of marijuana (which the state of Florida has permitted him to lawfully use), and two years later holding a firearm for a photo.[2] These are not "dangerous" offenses. Further, the Defendant has had ample time since 2019 and 2021, to reveal via his actions and conduct, that he was not intent on obtaining a firearm. He never obtained or attempted to obtain a firearm again.

In their motion, the government reveals what the true nature and basis for this prosecution has always been: a prosecution using the charged marijuana offense to attempt to punish the Defendant's former statements and words. This is why the government cites to the Sixth Circuit's ruling in *United States v. Rayyan,* 885 F.3d 436 (6th Cir. 2018), while arguing that the Fifth Circuit's decision in *United States v. Daniels,* 77 F.4th 337, 339-40 (5th Cir. 2023) does not apply to this case.

---

2 The Defendant's objection to the inclusion of certain facts in the "offense conduct" section of the PSI reflects how the government and the PSI have attempted to broaden the scope of the acts in this case beyond the mere facts that supported the Grand Jury indictment in this case, to factors that could not have supported a charge or prosecution.

Such a prosecution based on speech is specifically prohibited by the First Amendment, which protects all speech that is not obscenity, slander, incitement, or a "true threat." The Defendant cannot be prosecuted for the statements he has made because they are not obscene, incitement, slanderous, or "true threats." Yet, the government now seeks to base an upward departure or variance request upon that factor.

**2) The government seeks an upward departure based on speech:**

What is absolutely clear, is that even speech that is repugnant, in a variety of ways, is protected by the First Amendment. The Ninth Circuit's holding in *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011), demonstrates the extraordinary scope of the First Amendment's protection. That court held that a man's repugnant posts about killing a Presidential candidate – "Re: Obama fk the niggar, he will have a 50 cal in the head soon … shoot the nig," – were protected, notwithstanding alarming circumstantial evidence. *See Bagdasarian*, 652 F.3d at 115-16. A search of Bagdasarian's home revealed six firearms, including a Remington model 700ML .50 caliber muzzle-loading rifle, and .50 caliber ammunition. *Id*. at 1116. A search of his computer also revealed emails sent on election-day showing a link to a webpage advertising a large caliber rifle, saying: "Josh needs to get us one of these, just shoot the nigga's car and POOF!" Another showed a link to a video of blown-up cars saying

12

"when you use a 50 cal on a nigga car you get this." *Id*. Nonetheless, the court found that his words were protected:

> When our law punishes words, we must examine the surrounding circumstances to discern the significance of those words' utterance but must not distort or embellish their plain meaning so that the law may reach them. Here, the meaning of the words is absolutely plain. They do not constitute a threat and do not fall within the offense punished by the statute.

*Id*. at 1120. The speech in *Bagdasarian* was abhorrent, violent rhetoric, with no apparent redeeming value. It was an extreme and disgusting manner of expressing dislike for a candidate based entirely upon racism. Moreover, *Bagdasarian* was actually heavily armed, and had the ability to carry out the type of violence he wrote about. Nonetheless, the speech was protected.

Also never arrested or charged for repugnant, violent rhetoric was (now former) Colorado Congressman Ken Buck, who posted a video to Twitter challenging former US Representative Beto O'Rourke and former vice president Joe Biden to come to his office and take his AR-15, which he was holding in the video. In the video Buck stated: "I have a message for Joe Biden and Beto O'Rourke, if you want to take everyone's AR-15s in America, why don't you swing by my office in Washington, D.C. and start with this one, Come and take it." https://www.cnbc.com/2020/03/06/rep-ken-buck-dares-joe-biden-and-beto-orourke-to-take-ar-15-rifle.html (last accessed June 30, 2023). Obviously, Buck was making the un-spoken threat he would use the AR-15 against them if they came to his office to try and disarm him, and showing that he

was equipped to do so. Similarly, Florida (state) representative Randy Fine wrote to President Biden on Twitter, ""I have news for the embarrassment that claims to be our President — try to take our guns and you'll learn why the Second Amendment was written in the first place." Fine was never arrested or charged. On December 21, 2020, then Congressman-elect Madison Cawthorn told a rally to "lightly threaten" their members of Congress and tell them "everybody is coming after you." https://www.scribd.com/document/491732014/Cawthorn-Complaint# (last accessed July 5, 2023). Cawthorn was never arrested or charged with incitement. In January, 2023, Congressman Eric Swalwell received a private message from a man in Indiana named Jonathan Reeser. Part of the message reported by the media read:

> I HOPE YOU FAMILY IS RAPED AND MURDERED AND I HOPE YOU GET TIED TO THE BACK OF A TRUCK AND DRUG 10,000 MILES UNTIL YOU BODY IS RIPPED TO PIECES YOU SCUM. I WISH I SAW YOU IN PERSON ID BREAK YOUR (explicit) FACE SO FAST YOUD HAVE PLASTIC SURGERY AND NEVER LOOK THE SAME AGAIN.

https://www.indystar.com/story/news/politics/2023/01/14/indiana-man-threatens-u-s-rep-eric-swalwell-loses-job/69809292007/. (last accessed June 28, 2023)(all caps in original). Reeser was never arrested or charged for the message that was sent. In May, 2023, Congressman Swalwell was reportedly threatened by Bruce Miller via private message, which read: "'Almost time!!! Would you rather Guantanamo or just execution f—kin traitor,'" along with three cry-laughing emoji." Miller engaged in further dialogue with Congressman Swalwell, following up: "that punishment is in the cards for you and many others!" https://www.sfgate.com/49ers/article/49ers-

bruce-miller-swalwell-threat-18106503.php (last accessed June 29, 2023). Miller has not been arrested or charged for the threats. In November, 2021, Congressman Paul Gosar, of Arizona, was censured by the U.S. House of Representatives for posting on his social media account an anime "character with Gosar's image wielding a sword to kill a character with the image of [Democratic Congressperson Alexandria] Ocasio-Cortez," of New York, who has been the subject of intense hate by many persons in the opposition political party. https://www.npr.org/2021/11/17/1056397130/rep-gosar-faces-censure-over-an-anime-video-of-himself-killing-aoc (last accessed June 29, 2023). Gosar was not charged with any crime, despite Congressperson Steny Hoyer noting that "the video could qualify as a criminal offense since making threats against federal officials is illegal." Id. In April, 2021, NBA superstar LeBron James "tweeted" and later deleted "a photo of [police] officer Nicholas Reardon, with an accompanying caption, "YOU'RE NEXT #ACCOUNTABILITY," along with an hourglass emoji," following the officer's fatal shooting of a black female. https://www.espn.com/nba/story/_/id/31306343/lebron-james-explains-why-deleted-tweet-police-shooting-makhia-bryant (last accessed June 29, 2023). James was never charged with any crime for the post. In October, 2021, at a public meeting for a political action committee, TPUSA, an attendee in Idaho inquired of the TPUSA speaker when they could begin using guns against Democrats, and indicated that he was not joking. https://www.mediamatters.org/charlie-kirk/pushing-election-lies-tpusa-audience-member-asks-charlie-kirk-when-they-can-use-guns (last accessed

June 29, 2023). The man was never arrested or charged for the threat against "Democrats." Similarly, in May, 2023, the governor of South Carolina, speaking to a convention, stated, "'I look forward to the day that Democrats are so rare, we have to hunt them with dogs'…. Christale Spain, chairwoman of the South Carolina Democratic Party, decried [the governor's] comments as 'absolutely chilling' to hear." Spain noted that, "[t]he majority of the Dem electorate in SC is Black and our governor is saying out loud he can't wait to hunt us down with dogs." Spain, also noted the well-known history of South Carolina, where dogs were used against black slaves, and that the Governor's statement was an obvious "dog whistle" advocating political and race based violence. https://www.nbcnews.com/politics/politics-news/democrats-blasted-gov-mcmaster-remark-hunting-dogs-rcna85744. (last accessed June 29, 2023). Despite calls by Spain and others for law enforcement action based on the threatening comment, no charges or arrests were made.

Unfortunately, the rawest and extreme passions are often accompanied by abhorrent speech. The United States protects the virtually unfettered right of persons and organizations to engage in "vehement, caustic, and .. . unpleasantly sharp" speech. *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002), *quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964). Chief Justice Roberts articulated this principle in *Snyder v. Phelps*, where the Court held that an inflammatory protest by the Westboro Baptist Church at a soldier's funeral service was protected under the First Amendment. 562 U.S. 443, 451, 458 (2011). The speech that the Supreme Court

16

determined was protected in that case included: that at the soldiers' funerals, the church carried signs that read "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You." *Id.* at 448.

The speech referred to by the government in this case is indeed caustic and repugnant. The government notes that in this case the Defendant began "making threats to carry out a mass shooting event" in 2013. [DE:67 at 3]. Yet, the comments the Defendant made were words, and speech, and did not rise to the level of actual threats. The Defendant was never charged for a violation of 18 U.S.C. § 875(c), which criminalizes the interstate communication of a true threat, presumably because the communication was not perceived as a "true threat." Further, the Defendant made no attempts to obtain a firearm in 2013 (or 2014-18). The evidence reveals that the Defendant did not make any attempt to obtain a firearm until six years later, in 2019.

Thus, for all the government's argument that the Defendant was attempting to obtain a firearm to carry out a mass shooting, that contention is nothing more than an opinion, without a basis in evidence. If, as the government indicates, the Defendant began making statements about carrying out shootings in 2013, a ten-year period expired (prior to this prosecution) where the Defendant did not obtain a firearm. The ease with which prohibited persons obtained firearms during that time period (2013-2023) is reflected in federal prosecutions for **prohibited** persons

possessing firearms. United States Sentencing Guideline § 2K2.1 was used in 78,270 federal cases between 2013-2023. (all data taken from : https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2023/Ch2_Guideline_FY23.pdf (last accessed July 3, 2024). The Defendant *talked* about wanting to obtain a firearm, but never went about attempting to *obtain* a firearm other than the one time in 2019, and never again afterwards, either legally, or illegally.

As is obvious from count three of this prosecution, the Defendant did have access to a firearm (at least for purposes of taking a picture with it in 2021). The Defendant never made any attempt to further possess that firearm in or after 2021. Thus, while the government refers to the Defendant's conduct as a "compulsive focus on possessing and using firearms," [DE:67 at 3], that focus was merely on *discussing* obtaining firearms. Over a ten-year period of communications, the Defendant never moved to carry out any of the actions he was discussing.

For support, the government cites to *United States v. Rayyan,* 885 F.3d 436 (6th Cir. 2018), which the government's motion indicates appears similar to this case. Yet, an examination of the facts in that case reveals *significant* differences. In *Rayyan,* the Defendant did actually purchase and obtain a firearm (unlike this case). When he was arrested, *Rayyan* was carrying the firearm concealed, without a permit (unlike this case). After his arrest, with the firearm seized, *Rayyan* attempted to purchase

another firearm (unsuccessfully) (unlike this case). After unsuccessfully attempting to purchase a firearm after his arrest, *Rayyan* went to a shooting range with a friend and shot an AR-15 rifle and AK-47 rifle that he rented (unlike in this case). The Court in *Rayyan* noted a lack of any mental health condition, unlike here. He posted a photo of himself with the rifle making a terrorist group hand gesture and captioned it that he was hunting Iraqi's unsympathetic to the Islamic state (unlike this case). After that:

> an undercover FBI employee posing as a 19-year-old woman who sympathized with the Islamic State messaged him. Rayyan told the agent a number of disturbing things. He claimed that he had "planned out" an attack on a large church near where he worked and described making preparations. …. He thought the church would make a good target because "people are not allowed to carry guns in church," and "it would make the news." …He never carried out his plan. But he "regret[ted] not doing it." If he could not "do jihad [in] the midd[le] east," he wanted to "do ... jihad over here." … He claimed he "would[']ve killed every last one of them[.] Especially the wom[e]n and children." …
> Later that month, he told the undercover agent that he wanted to murder one of the officers who arrested him.

*Id.* at 439. If anything, *Rayyan* reveals all of the conduct this Defendant could have done, but did not, over a ten-year period.

*Rayyan* took actual, repeated, intentional steps to continuously arm himself, and posted his online photo while armed with a caption related to the support of terrorism, which this Defendant did not do. *Id.* at 440. *Rayyan* had a multitude of acts ("a*ctus reus")* that supported the intent ("*mens rea")* of his comments. The

Defendant here did not. The importance of this type of evidence was recently noted by the Supreme Court in, *City of Grant's Pass, Oregon v. Johnson,* 2024 WL 3208072 *12 (June 29, 2024), which included that,

> historically, crimes in England and this country have usually required proof of some act (or *actus reus*) undertaken with some measure of volition (*mens rea*). At common law, 'a complete crime' generally required 'both a will and an act.' 4 Blackstone 21. This view 'took deep and early root in American soil' where, to this day, a crime ordinarily arises 'only from concurrence of an evil-meaning mind with an evil-doing hand.'

*Id., Quoting, Morissette v. United States*, 342 U.S. 246, 251–252 (1952). In this case, the Defendant's actions reveal a lack of intent.

There is no evidence that the Defendant's possession of the firearm in 2021 had anything to do with any comments the Defendant made prior to that date or after. The evidence shows that the possession was merely a momentary possession for purposes of taking a photo by his father and father's friend. No attempt to transfer the firearm to the Defendant ever occurred.

On June 18, 2019, the Defendant attempted to purchase a firearm. There is no indication that he was attempting to purchase the firearm to carry out a murder. The government attempts to link three comments the Defendant made three months earlier, and a comment a month earlier to the attempted purchase. [DE:67 at 3]. During that same time period, the Defendant communicated with his girlfriend about using marijuana, obtaining marijuana, playing video games, watching television

shows like "South Park," cooking pizza, and watching movies. There are no actions by the Defendant during this ten-year time period which reveal that the Defendant was attempting to obtain a firearm to carry out a murder. In sum, the comments the government points to are not backed up by *actions* of the defendant. If the criminal justice system reveals anything, it is that firearms are readily available to those who have an actual "compulsive" wish to obtain them. The Defendant here took no steps before or after June 18, 2019, to actually obtain a firearm.

**3.      The Defendant posted helpful messages to social media also:**

The government has filed approximately sixteen messages and/or screenshots from the Defendant's phone in support of their motion to upward vary above the Sentencing Guidelines in this case. The posts, and the messages he engaged in stem from the period of 2019-2022. The Cellebrite extraction report in this case for the Defendant's phone reveals a total of 1,113 instant messages; 372 chats; 1,572 e-mails; 334 calls in the call log; 1,829 pages of chats with "MyOneandOnly" at 347-957-9582 (the Defendant's girlfriend who is the person the Defendant was "chatting" with in the messages the government attached as exhibits); and, 601,712 "media artifacts." From these voluminous records, the government refers to chat conversations between the Defendant and his girlfriend on March 11, 2019, March 13, 2019, March 15, 2019, May 14, 2019, May 30, 2019, November 28, 2019, December 3, 2020, December 8, 2020, June 4, 2022, and June 23, 2022.

Obviously, the overwhelming majority of the Defendant's chats and online posts did not refer to firearms or murder. The Defendant speaks in the chats repeatedly of his mental health issues (and his girlfriend's, who is also autistic). For example, on August 1, 2022, the Defendant complained to his girlfriend that his therapist was not helping with his anxiety, and that the doctor was merely "upping" his medications. The Defendant stated he has "SEVERE anxiety" (caps in original), that would result in him sweating so profusely, it looked as though he had "jumped in pool." (see Exhibit J). On Jul 12, 2022, the Defendant confided to his girlfriend that he felt "overwhelmed," and lost "all the time" and that she was like "therapy" to him. The Defendant indicated he needed to see his "shrink asap." (see Exhibit K). On January 1, 2022, the Defendant posted to his Facebook account a photo with the phone numbers for hotlines to help with suicide prevention, bullying, self-harm, sexual assault, lifeline, grief support, depression, drugs and alcohol, eating disorders, mental health, and abuse. He included "emojis" reflecting strength and love. (see Exhibit L). On September 11, 2021, the defendant posted on his Facebook account a helpful chart of warning signs for suicide. (see Exhibit M). On July 17, 2022, the Defendant posted on his Facebook account a message, "speak somn say somn," with the strength and love emojis, along with photos of a suicide prevention phone number and a photo to contact the "National Suicide Prevention Hotline." (see Exhibit N). On July 14, 2022, he posted a message on his Facebook account stating "Aspergers" with

a love symbol, and a photo for a "Autism Signs In Adults," advertisement. (see Exhibit O).

On June 14, 2022, the Defendant searched Google on his phone for "Life Skills of South Florida," a mental health clinic in Broward County. (see Exhibit P). The next day, the Defendant searched on his phone for "Therapies by Eileen," a holistic therapy provider. (see Exhibit Q). On June 22, 2022, the Defendant downloaded a list of providers for mental health and substance abuse assistance in Broward County. (see Exhibit R). On July 12, 2022, the Defendant searched the term "211," on Google, which is a hotline for "essential community services" by United Way. (see Exhibit S). On July 17 and 18, 2022, the Defendant searched on his phone for the "988 Hotline," a suicide and crisis lifeline. (see Exhibit T).

As noted in the PSI, the Defendant has significant mental health issues, some of which are the result of long term victimization, and others that appear to be genetic. It is clear in the phone extraction report that the Defendant goes through up and down cycles. The Defendant's history of Baker Acts re-affirms this conclusion. Over this 10-year period, the Defendant has never moved to act on those thoughts he communicated.

### 4.   A person's mental illness is not a factor that supports an upward departure or variance:

The government next argues that the Defendant has "troubling characteristics" that support an "upward variance." The "troubling characteristic" the government points to is the Defendant's mental illness.

The Defendant does not control his status as a person with a mental illness. This is not a case where the Defendant refused to take prescribed medications, or committed criminal acts while intoxicated (or under the influence). He did not ask for or cause himself to be depressed, or Bipolar, or anxious, or have ADDHD. Nor did the Defendant cause himself to have PTSD or Autism. The State of Florida certainly caused several of these conditions (notably the PTSD, anxiety, and depression). See PSI at ¶¶'s 45, 47, 48, 49, 50, & 51. Nonetheless, the Defendant still has no control over his status as a person with multiple mental disabilities. Nor, in light of what the State of Florida permitted to happen to the Defendant while in their custody and care (and later, when the state resolved the case involving the perpetrator) can the Defendant be blamed for using marijuana as a medicinal substance to calm his anxiety and PTSD. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6397040/ (last accessed July 2, 2024) (National Institute of Health study about the benefits of cannabis use for PTSD).

Yet, the government now seeks to enhance the Defendant's sentence for his mental illness and addiction to medicinal marijuana. [DE:67]. Punishment based on this "status" violates the Eighth Amendment's prohibition on cruel and unusual punishment. *See, City of Grant's Pass, Oregon v. Johnson,* 2024 WL 3208072 *12 (June 29, 2024).[3] In *Grant's Pass,* the Court made note of a former opinion in

---

3 The ruling in *City of Grant's Pass, Oregon v. Johnson,* 2024 WL 3208072 *12 (June 29, 2024), would appear to make this entire prosecution, based upon the Defendant's addictive use of medicinal marijuana a violation of the Defendant's

*Robinson v. California*, 370 U.S. 660 (1962), which determined that criminalizing a person's "status" as an addict violated the Eighth Amendment. Quoting from *Robinson,* the *Grant's Pass* ruling noted that "the Court held only that a State may not criminalize the 'status' of being an addict. …. In criminalizing a mere status, *Robinson* stressed, California had taken a historically anomalous approach toward criminal liability." *Id* at *13, *Quoting Robinson,* 370 U.S. at 664, 666 (internal citations omitted). The Court in *Robinson* ruled that punishing a person's status as an addict was cruel and unusual punishment. *Robinson,* 370 U.S. at 666-67.

Exactly as in the case of an addict, without control of their status as such, a person suffering from a mental illness has no control of their status as a person with that mental disability. The Sentencing Guidelines recognize this exact conclusion, providing for a *downward* departure for persons with significant mental illness. See U.S.S.G. § 5H1.3. The PSI in this case notes that this Defendant may qualify for just such a downward departure. PSI at ¶ 106. The Sentencing Guidelines (recognizing this fact) do not offer a competing section to provide for an *upward* departure for a mental illness. Nor could they, as the reasoning in *Robinson* makes abundantly clear: Under the Eighth Amendment, a person cannot be punished because they have a

---

Eighth Amendment rights, as it is based on the criminalization of his status as a marijuana addict. That ruling, citing to a former ruling from 1962 noted that, "the Court charted its own course, reading the Cruel and Unusual Punishments Clause to impose a limit not just on what punishments may follow a criminal conviction but what a State may criminalize to begin with." *Id.* at *13. As such, the Defendant moves to dismiss the indictment in this case.

mental illness status that is entirely outside their control. The PSI makes clear what the State of Florida caused in this Defendant's background via neglect and an incredible level of disgraceful ineptitude. The Defendant had no control over developing suicidal ideation or PTSD; he had no control over developing sometimes debilitating anxiety and depression. Yet, the government of the United States is seeking to *enhance* his sentence based on his mental illness in their motion. [DE:67 at 6-7].

The course of the Defendant's life was altered prior to him even being born (based upon his mother's use of narcotics while he was in utero). Soon after birth, and prior to the Defendant having cogent thought, the state removed him from his abusive parent's custody. Yet, the state placed him in an unlicensed foster home, where he was routinely abused at a young age. That abuse continued throughout his life, in a variety of manners, always in homes he was placed in by the state. When the Defendant finally broke this victimization, by going to law enforcement and reporting it, the state resolved that case by sentencing his abuser (who had fled and been returned from Georgia) to a term of probation. As the Defendant has routinely asked of his counsel, "why can't I be treated like that?" Indeed, quite the opposite, once the Defendant was prosecuted, the government made it clear that they would seek this upward variance/departure whether the Defendant proceeded to trial, or plead guilty. The Defendant was once again given no options, this time by a different sovereign. After the lifetime of damage that had been done, the Defendant's phone reveals that

by 2022, he was desperately looking for help that was either not provided, or could not help him. The state of Florida has rendered him damaged and should eb making every conceivable effort to help him. The Defendant does not deserve an upward variance in this case. The Defendant certainly qualifies for a downward departure under U.S.S.G. § 5H1.3.

WHEREFORE, the Defendant moves this Court to sustain his objections to the PSI.

Respectfully submitted,

HECTOR DOPICO
INTERIM FEDERAL PUBLIC DEFENDER

By:    _s/ *Jan C. Smith, II*_____
Assistant Federal Public Defender
Florida Bar No. 0117341
One East Broward Boulevard, Suite 1100
Fort Lauderdale, Florida 33301-1842
Tel: 954-356-7436
Fax: 954-356-7556
E-Mail: Jan_Smith@fd.org

**CERTIFICATE OF SERVICE**

27

I HEREBY certify that on July 9, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: ___s/ *Jan C. Smith, II* AFPD_____